

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

KENNETH BARNES

Vs.                                                     C.A. No.          2013 CA 007142 B

DISTRICT OF COLUMBIA DEPT. OF YOUTH REHABILITATION

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to:  Judge MICHAEL O'KEEFE
Date:   October 22, 2013
Initial Conference: 9:15 am, Friday, January 24, 2014
Location:   Courtroom B-52
                510 4th Street, NW
                WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www:dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

*Kennel Barnes*
_____
Plaintiff

vs.                                    Case Number **13-0007142**

*District of Columbia-Dept. of Yos/1 Rehabilitation*
*serves Irwin Nathan, Attorney General*
_____
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*James Fournier*
_____
Name of Plaintiff's Attorney

*65 Bryant St. NW*
_____
Address
*Washington, DC 20001*

*202 518-0059*
_____
Telephone

Clerk of the Court

By _____
Deputy Clerk

Date *10/22/13*

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828 로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-682-2700) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                                CASUM.doc

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **KENNETH BARNES,**<br>1400 Irving Street, N.W. #425<br>Washington, DC 20010 | )<br>)<br>) |
| **Plaintiff,** | )<br>) **13 - 0 0 0 7 1 4 2** |
| **v.** | )<br>) |
| **DISTRICT OF COLUMBIA,** | ) **C.A. No.** _____ |
| **Defendant.** | )<br>) |
| **SERVE:** | )<br>) |
| **NEIL STANLEY**<br>**DIRECTOR**<br>**DEPARTMENT OF YOUTH**<br>   **REHABILITATION SERVICES**<br>450 H Street, N.W.<br>Washington, DC 20001 | )<br>)<br>)<br>)<br>)<br>) |
| **– and –** | )<br>) |
| **VINCENT C. GRAY**<br>**MAYOR**<br>**DISTRICT OF COLUMBIA**<br>1350 Pennsylvania Avenue, N.W.<br>Washington, DC 20004 | )<br>)<br>)<br>)<br>) |
| **– and –** | )<br>) |
| **IRWIN B. NATHAN**<br>**ATTORNEY GENERAL**<br>**DISTRICT OF COLUMBIA**<br>441 4th Street, N.W.<br>Washington, DC 20001 | )<br>)<br>)<br>)<br>) |

## COMPLAINT FOR MONEY DAMAGES

1. Plaintiff Kenneth Barnes ("Plaintiff" or "Mr. Barnes") hereby files this Complaint for damages based upon the denial of his rights under: (i) the American With Disabilities Act, 42 U.S.C. §§ 1201, *et seq.*, as amended (the "ADA"); (ii) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, as amended ("Title VII"); (iii) the District of Columbia Human

Rights Act of 1977, D.C. Code §§ 2-1401, *et seq.*, as amended (the "DCHRA"); and (iv) the District of Columbia Whistleblower Protection Act ("DCWPA"), D.C. Code § 1-615.51, *et seq.*, and alleges as follows:

## PRELIMINARY STATEMENT

2. Defendant, the District of Columbia Department of Youth Rehabilitation Services ("DYRS"), discriminated against Mr. Barnes based upon his age and disability and/or perceived disability; failed to properly provide accommodations for his age, disability and/or perceived disability; inflicted upon him a hostile work environment, and; improperly retaliated against Mr. Barnes for his informing the Mayor and others of the gross mismanagement, gross misuse of public resources and funds, and abuse of authority in connection with the administration of Defendant DYRS.

## JURISDICTION

3. Subject matter jurisdiction of this Court is founded on D.C. Code § 11-921 (2001), as amended and D.C. Code § 2-1403.16 because Plaintiff has filed this suit in the District of Columbia and no Federal court has exclusive jurisdiction over this matter.

4. The Court has personal jurisdiction over Defendant pursuant to D.C. Code §§ 13-334, 13-422, 13-423 (2001), as amended, and D.C. Code § 2-1403.16 because Defendant DYRS employed Plaintiff in the District of Columbia and the acts, omissions, and/or injuries occurred in the District of Columbia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. Plaintiff has exhausted all administrative remedies by filing a charge of discrimination with the District of Columbia Office of Human Rights, which was cross-filed with the Equal Employment Opportunity Commission.

6. In addition, Plaintiff has filed the instant complaint within 90 days of having received his right to sue letter from the Equal Employment Opportunity Commission.

## PARTIES

7. Mr. Barnes is a sixty-eight year old African-American male residing at the address set forth in the caption of this Complaint.

8. Upon information and belief, Defendant DYRS is a governmental agency of the District of Columbia with its principal place of business located at the address set forth in the caption of this Complaint.

## FACTS COMMON TO ALL COUNTS

9. On or about January 16, 2012, Defendant DYRS hired Mr. Barnes as a Program Support Specialist, Parents and Family Affairs, at an annual salary of $68,319.00.

10.    Mr. Barnes holds a bachelor's degree in psychology and a master's degree in clinical psychology. At all times relevant to this matter, he possessed the requisite skills, education, and experience for his position at DYRS.

11.    At the time that DYRS hired Mr. Barnes, DYRS knew that Mr. Barnes had tremendous experience and personal commitment to addressing the problems of troubled youth.

12.    In 2001, Mr. Barnes's only son, Kenneth Barnes, Jr., was murdered by a 17 year-old youth. It was later discovered that the youth was an absconder from the juvenile justice system in the District of Columbia and had murdered two others prior to murdering Mr. Barnes's son.

13.    Since his son's murder, Mr. Barnes has been committed to helping to reduce incidents of gun violence, both locally and nationally. In 2002, Mr. Barnes founded the

- 3 -

organization R.O.O.T. – Reaching Out to Others Together.  Along with establishing ROOT, Mr. Barnes also developed a marketing campaign – GUNS ASIDE – as an awareness campaign. GUNS ASIDE consisted of a series of posters – with a shaded hand holding a gun – sequentially titled HOMICIDE, SUICIDE, GENOCIDE, and GUNS ASIDE.  In addition, Mr. Barnes and his organization developed a model to reduce violence and gun violence titled "Community in Action Neighborhood Defense Act" (known as the CANDO Bill).  In 2008 Congressman Bobby Rush (D-Ill) introduced the CANDO Bill (which was re-introduced in 2009).  Congressman Rush recognized Mr. Barnes on the floor of the United States Congress for serving as a catalyst for the Bill.

14.     Mr. Barnes had previously worked with Deputy Mayor Paul Quander when he and Mr. Quander had worked together on a task force to reduce homicides when Mr. Quander was director of Court Services and Offender Supervision Agency for the District of Columbia. When Mr. Quander became Mayor Vincent Gray's Deputy Mayor for Public Safety, he contacted Mr. Barnes, and after several meetings and conversations, Mr. Quander thought that Mr. Barnes could be of assistance to Neil Stanley, the then-incoming Director of DYRS.

15.     At the time DYRS hired Mr. Barnes, Mr. Barnes was assured that he was in fact a DYRS permanent career employee.  DYRS's management's treatment of Mr. Barnes throughout his tenure with DYRS reflects that Mr. Barnes was a career employee of DYRS.

16.     Mr. Barnes subsequent requests to DYRS to clarify his position requirements state that Mr. Barnes was a career employee of DYRS, and Mr. Barnes understood that he was a career employee of DYRS.

17.     At the time that DYRS hired Mr. Barnes, DYRS knew that Mr. Barnes had severely limited vision and was legally blind.

18.     Although Mr. Barnes had tremendous front-line experience addressing the problems of troubled District of Columbia youth, and although DYRS knew that Mr. Barnes was legally blind, DYRS gave Mr. Barnes nearly exclusively administrative duties and responsibilities that required significant transportation.

19.     Accordingly, on or about January 29, 2012, almost immediately upon beginning his employment with DYRS, Mr. Barnes requested special accommodation for his very limited sight from his immediate supervisor, then-Deputy Director Barry Holman ("Mr. Holman").

20.     Mr. Holman informed Mr. Barnes that "there was no money in the budget" to accommodate his disability and that Plaintiff should instead contact human resources and Kris Laurenti, the person in charge of interns and collaborations.

21.     Understanding that he had to immediately address the need for an accommodation for his very limited vision, and desperate to do so, Mr. Barnes hired his own assistant – Clinton Murchison – and paid for his services from his own pocket.

22.     Mr. Barnes had met Mr. Murchison after submitting his request for assistance to the District of Columbia Department of Employment Services (the "DOES"). Mr. Barnes personally hired Mr. Murchison following Mr. Murchison's approximately twenty-eight year incarceration for murder.

23.     DYRS management, and most of the office, knew that Mr. Barnes was paying for Mr. Murchison's assistance out of his own pocket.

24.     Though Mr. Murchison was helpful to Mr. Barnes, he was primarily responsible for transporting Mr. Barnes to and from DYRS meetings and functions. Given his long incarceration and limited educational and technological background, Mr. Murchison was unable to provide administrative assistance.

—

25.     Accordingly, for months after his initial request for administrative assistance, and for months after Mr. Barnes had personally hired Mr. Murchison, Mr. Barnes repeatedly requested additional assistance to accommodate his disability.

26.     In February 2012, Kris Laurenti in DYRS human resources office replied to Mr. Barnes request and stated that he should once again contact DOES for staffing. Mr. Barnes sent the required paperwork to his then supervisor, Barry Holman. Mr. Barnes never received a response.

27.     Accordingly, later in February 2012, Mr. Barnes then sought to obtain an administrative assistant through his own contacts at George Washington University's ("GWU") department for intern assistance.

28.     On or about February 21, 2012, Mr. Barnes was assigned a disability specialist from DYRS Human Resources, Ms. Satina Smith ("Ms. Smith"). She states that she is specifically assigned to work with Mr. Barnes on obtaining assistance for his disability.

29.     Ms. Smith emailed Barry Holman concerning Mr. Barnes's disability and sought Mr. Holman's assistance, as Mr. Barnes's immediate supervisor, to follow through with Mr. Barnes's requests for accommodation for his disability and for assistance from DOES and GWU. Ms. Smith represents to Mr. Barnes that she never received a response from Mr. Holman.

30.     On March 5, 2012, while still attempting in vain to obtain direly needed administrative assistance for his very limited visibility, Mr. Barnes drafted a report to Mayor Vincent Gray, Deputy Mayor Paul Quander, and Deputy Mayor Beatrice Otero. Mr. Barnes's lengthy e-mail report and attachment outlines, among other things, gross mismanagement, extremely low morale, and growing mission failure at DYRS.

31.     Following his March 5, 2013 report, the Mayor's office requested a meeting.  Mr. Barnes met with the Director of DYRS, Neil Stanley; the Deputy Mayor for Public Safety Neil Quander; and Deputy Mayor for Health and Human Services Beatrice Otero.  The meeting was held in Mr. Quander's office.  At the meeting, the deputy mayors expressed concerned that Neil Stanley and Mr. Barnes "were not getting along," but did not address the issues of mismanagement or any of the issues raised in Mr. Barnes's report that formed the genesis for the meeting.

32.     Deputy Mayors Quander and Otero stated that Mr. Barnes and Director Neil Stanley should meet alone immediately following the meeting in order to discuss the issues raised in Mr. Barnes's March 5, 2012 report.  Messers. Barnes and Stanley did so.  Mr. Stanley refused to address the issues of mismanagement or any of the issues raised in Mr. Barnes's report.

33.     By April 2012, Mr. Barnes had still not received any proper accommodation for his disability from DYRS, although he had followed every request for additional documentation from DYRS

34.     Because Mr. Barnes was receiving no assistance from the agency generally or from his immediate supervisor, Barry Holman, DYRS's Human Resources office suggested that Mr. Barnes contact DYRS's Chief Operating Officer, Chris Shorter, about receiving accommodation for his disability.  Mr. Barnes does so on or about April 9, 2012.

35.     On or about April 10, 2012, Chris Shorter referred Mr. Barnes back to Barry Holman.  Although DYRS knew that Mr. Barnes was legally blind from the day he was hired, and although Mr. Holman knew that Mr. Barnes was paying Mr. Murchison for transportation

assistance – from his own pocket – Mr. Holman again does not provide Mr. Barnes with assistance and accommodation for his disability.

36.     On or about April 27, 2012, Mr. Barnes once again e-mailed Chris Shorter about his increasingly dire need for accommodation for his very limited sight.   Mr. Barnes is particularly concerned because he has been given newly assigned tasks for developing strategic plans for family engagement which require significant administrative and travel responsibilities.

37.     On or about May 11, 2012, Mr. Barnes is introduced to his new supervisor, Sam Williams ("Mr. Williams").   Mr. Barnes had no prior knowledge that he would be working under a new supervisor.

38.     On June 4, 2012, Mr. Barnes e-mailed Mr. Williams informing him that he no longer had the services of Clint Murchison because he could no longer afford to pay Mr. Murchison.   Mr. Barnes further informed Mr. Williams that he had no other assistance to accommodate his disability.

39.     Mr. Williams's only response was "thank you."

40.     On or about June 15, 2012, Mr. Barnes was forced to cancel a "Parents Advisory Council" meeting scheduled for June 19, 2012 – part of an important effort to strategically engage parents – because had he received no DYRS agency support to accommodate his disability so that he could properly prepare for the meeting.

41.     Similarly, on June 19, 2012 Mr. Barnes was assigned to participate in a "gang task force" meeting convening at the New Beginnings facility, located in Laurel, Maryland.   Mr. Barnes had sent a request to DYRS management requesting assistance to prepare for the meeting and to be transported to the meeting.   He received no response from anyone at DYRS.

42. On July 27, 2013, Mr. Barnes was directed to attend a meeting at DYRS's primary facility, located at 450 H Street, NW, Washington. D.C. Mr. Barnes sent an e-mail to a new DYRS Deputy Director, Steven Luteran ("Mr. Luteran"), requesting transportation assistance so that he could attend the meeting. Mr. Luteran directed Mr. Williams to have Mr. Barnes picked up. Mr. Williams responded that Barnes will need to get there the best way he can.

43. Not knowing what else he could possibly do, on August 3, 2012, Mr. Barnes filed an EEOC complaint with the Mayor's Office, Department of Disability, in order to obtain an accommodation for his disability. Mr. Barnes informed DYRS's management and the Mayor that he had done so.

44. That same day, Mr. Barnes received an e-mail from DYRS's new Chief Operating Officer, Ms. Regina Stanley ("Ms. Stanley"), stating that she understood Mr. Barnes's concerns and to please give her an opportunity to rectify.

45. Ms. Stanley set up a meeting with then-Human Resources Manager Jamie Thomas. Ms. Stanley promised to personally attend. No meeting was ever held.

46. On August 4, 2012, Mr. Luteran sent an e-mail stating that DYRS would provide administrative support to Mr. Barnes.

47. On or about August 7, 2012, Mr. Barnes e-mailed Mr. Luteran concerning his new direct supervisor, Samuel Williams', lack of concern for accommodating his known disability.

48. On or about August 8, 2012, Mr. Barnes emailed Mr. Luteran about having to move to a new office – located at DYRS's headquarters at 450 H Street N.W, Washington, D.C.

- 9 -

– with no supervision or assistance by DYRS's management.  Mr. Barnes only received assistance in moving his office from two DYRS employees who volunteered to help.

49.     On or about August 9, 2013, Mr. Barnes met with (i) his disability counselor, Ms. Hunt; (ii) Jamie Williams, the manager of DYRS's Human Resources, and; (iii) Satina Smith. Ms. Hunt made recommendations about what should be required of the agency.  DYRS represented that they would review why no one from DYRS followed up on Mr. Barnes's requests for assistance from DOES and GWU.

50.     On or about August 23, 2012, DYRS responded that Mr. Barnes needed no needed no accommodation for his disability and determined that he needed no administrative assistance.

51.     Nevertheless, DYRS agreed to provide dictation software to Mr. Barnes – an "accommodation" that Mr. Barnes had not been requesting and which was of no assistance to him.

52.     DYRS also promised to provide Mr. Barnes with a document reader, desktop fax software, and a desktop scanner.  DYRS failed to deliver any of the promised accommodations.

53.     In addition, in its August 23, 2012 determination, DYRS inexplicably added a new stipulation that among Mr. Barnes employment duties was to regularly, physically visit parents and the community.

54.     DYRS failed to explain why Mr. Barnes would now be assigned this task, particularly given his known disability that DYRS had just refused to accommodate.

55.     Further, DYRS's August 23, 2012 determination failed to explain DYRS's failure to follow-up on the initiative, already spearheaded by Mr. Barnes, to provide interns to assist him.

56.     Growing desperate, on August 28, 2012, Mr. Barnes emailed Samuel Williams requesting volunteer assistance through his own resources – people who are trained in parent engagement and willing to assist him. Mr. Williams responded that Mr. Barnes could not do so.

57.     When Mr. Barnes stated to Mr. Williams that it is DYRS's policy to solicit volunteers when it can do so, and requesting that Mr. Williams provide the basis for denying his request, Mr. Williams responded "because I said so."

58.     DYRS plainly and knowingly failed to accommodate to Mr. Barnes's disability. But to make matters worse, rather than accommodating Mr. Barnes's disability – a disability that DYRS knew of from the first day it hired Mr. Barnes – DYRS embarked on a policy of retaliating against Mr. Barnes for: (i) seeking accommodation for his disability; (ii) submitting his March 2012 report to the Mayor and deputy mayors reflecting DYRS's gross mismanagement, and; (iii) submitting his August 3, 2012 OHR/EEOC complaint.

59.     On September 10, 2012, Samuel Williams questioned why Mr. Barnes needed a fax machine and printer at his desk, questioning why Mr. Barnes could not travel from the 1st floor to the 9th floor and use the office's regular copier and fax "like everyone else." Mr. Williams asked Mr. Barnes "why do you think you're special or different than anyone else in this agency?"

60.     On September 10, 2012, after Mr. Barnes had e-mailed both Mr. Luteran and Mr. Williams to provide a detailed de-briefing on a number of excellent meetings conducted with a group of parents, Mr. Williams responded that Mr. Barnes's meetings were unauthorized – even though Mr. Barnes was following both Mr. William's and Mr. Luteran's directions.

61.     On September 11, 2012, Mr. Williams e-mailed Mr. Barnes stating that Mr. Barnes could be charged with insubordination for not following his orders. Mr. Barnes e-mailed

that he "could not believe this," that he had always followed Mr. Williams's instructions, and stated that he had always replied to Mr. Williams via e-mail, noting that they had not met in person regarding any purported concerns.

62.     On or about September 27, 2013, Mr. Williams, with Mr. Luteran present, met with Mr. Barnes in his office and gave Mr. Barnes a letter of admonition. The letter stated that Mr. Barnes had been insubordinate and had refused to comply with tasks assigned.  There was no mention of DYRS's continuing failure to accommodate Mr. Barnes's disability or of Mr. Barnes's continuing efforts to do so without DYRS's assistance.

63.     On or about October 11, 2013, Mr. Barnes e-mailed to Mr. Williams a point-by-point refutation of the September 27, 2013 letter of admonition, reflecting that each of Mr. Williams's contentions therein were either pre-textual and/or fabricated.

64.     Following Mr. Barnes's move to DYRS offices at 450 H Street, N.W. in August 2012, Mr. Barnes's office – and only his office – was inexplicably damp, drafty, and cold.

65.     Despite Mr. Barnes's repeated requests to have the obvious problems with his "new" office corrected, DYRS failed to do so, though Mr. Barnes had even submitted a letter from his physician stating that Mr. Barnes had "advanced chronic lung disease" and that "[a]lthough quite functional, [Mr. Barnes] cannot and should not be in any kind of work environment which is cold and damp since this would have a significant adverse effect on his respiratory status."

### FIRST CAUSE OF ACTION
#### Violation of the American With Disabilities Act
#### Failure to Accommodate

66.     Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 65 as if fully set forth herein.

67.     Defendant, the District of Columbia DYRS, was, at all times relevant to this matter, the employer of Mr. Barnes for all purposes under the American With Disabilities Act (the "ADA").

68.     Mr. Barnes is legally blind, and was legally blind, at the time that DYRS hired Mr. Barnes. His limited visibility was a physical impairment that substantially limited his ability to walk, read, work, and/or otherwise engage in other major life activities.

69.     Mr. Barnes's disability substantially limited his ability to travel, read, utilize a computer to prepare computer software-generated reports and documents, and substantially limited Mr. Barnes in other major life activities, such as, but not limited to, working, walking, reading and concentration.

70.     Defendant was informed of Mr. Barnes's need for an accommodation due to his disability and Defendant was at all times aware of Plaintiff's disability.

71.     Defendant failed to provide Mr. Barnes with a reasonable accommodation and failed to engage in a meaningful interactive process and communication with Mr. Barnes and/or his physicians to determine an appropriate and reasonable accommodation for Mr. Barnes as required by law.

72.     Defendant failed to take other measures, such as but not limited to telecommuting, a modified work schedule, modified work responsibilities, or other such reasonable accommodations that would have allowed Mr. Hodges to perform the essential functions of his job.

73.     Defendant, and/or its agents or employees acting on its behalf, failed to provide Plaintiff with Plaintiff with a reasonable accommodation, subjected him to other adverse and disparate treatment that interfered with his employment, and then terminated his employment.

74.     As a direct and proximate result of Defendant's unlawful conduct, Mr. Barnes has suffered and continues to suffer considerable injury.  This harm includes, but is not limited to, loss of substantial past and future salary and income, benefits, insurance, and other entitlements to employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits.

75.     Mr. Barnes has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from DYRS's discriminatory conduct and/or its agents or employees acting on its behalf, and the stress and anxiety caused by his inability to perform his job as he desired, the stress and anxiety caused by his wrongful termination, and resulting financial hardship.

76.     As a consequence of Defendant's foregoing unlawful activities, Defendant is liable to Mr. Barnes for the resulting damages, the attorneys' fees and costs incurred in bringing this action, and all post and pre-petition interest.

## SECOND  CAUSE OF ACTION

### Violation of the American With Disabilities Act
### Discrimination Based Upon Disability and/or Perceived Disability

77.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-76 as if fully set forth herein.

78.     Defendant, the District of Columbia DYRS, was, at all times relevant to this matter, the employer of Mr. Barnes for all purposes under the ADA.

79.     Mr. Barnes is legally blind, and was legally blind, at the time that DYRS hired Mr. Barnes.  This limited visibility was a physical impairment that substantially limited his ability to walk, read, work, and/or otherwise engage in other major life activities.

80.     Defendant and/or its agents or employees, acting on its behalf, subjected him to discrimination on the basis of his disability or perceived disability by failing to provide reasonable accommodations for his disability and by terminating his employment based on his disability or perceived disability.

81.     Defendant was informed of Mr. Barnes's need for an accommodation due to his disability and Defendant was at all times aware of Plaintiff's disability.

82.     Defendant repeatedly denied Plaintiff's requests for a reasonable accommodation failed to engage in a meaningful interactive process and communication with Mr. Barnes and/or his physicians to determine an appropriate and reasonable accommodation for Mr. Barnes as required by law, ultimate termination of Mr. Barnes constitute illegal discrimination against Mr. Barnes because of his disability and/or perceived disability.

83.     As a direct and proximate result of Defendant's unlawful conduct, Mr. Barnes has suffered and continues to suffer considerable injury.  This harm includes, but is not limited to, loss of substantial past and future salary and income, benefits, insurance, and other entitlements to employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits.

84.     Mr. Barnes has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from DYRS's discriminatory conduct and/or its agents or employees acting on its behalf, and the stress and anxiety caused by his inability to perform his job as he desired, the stress and anxiety caused by his wrongful termination, and resulting financial hardship.

85.     As a consequence of Defendant's foregoing unlawful activities, Defendant is liable to Mr. Barnes for the resulting damages, the attorneys' fees and costs incurred in bringing this action, and all post and pre-petition interest.

### THIRD CAUSE OF ACTION

#### Violation of the District of Columbia Human Rights Act
#### Failure to Accommodate

86.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-85 as if fully set forth herein.

87.     Defendant, the District of Columbia DYRS, was, at all times relevant to this matter, the employer of Mr. Barnes for all purposes under the District of Columbia Human Rights Act (the "DCHRA").

88.     Mr. Barnes is legally blind, and was legally blind, at the time that DYRS hired Mr. Barnes. His limited visibility was a physical impairment that substantially limited his ability to walk, work, and/or otherwise engage in other major life activities.

89.     Mr. Barnes's disability substantially limited his ability to travel, read, utilize a computer to prepare computer software-generated reports and documents, and substantially limited Mr. Barnes in other major life activities, such as, but not limited to, working, reading, walking, and concentration.

90.     Defendant was informed of Mr. Barnes's need for an accommodation due to his disability and Defendant was at all times aware of Plaintiff's disability.

91.     Defendant failed to provide Mr. Barnes with a reasonable accommodation and failed to engage in a meaningful interactive process and communication with Mr. Barnes and/or

- 16 -

his physicians to determine an appropriate and reasonable accommodation for Mr. Barnes as required by law.

92.     Defendant failed to take other measures, such as but not limited to telecommuting, a modified work schedule, modified work responsibilities, or other such reasonable accommodations that would have allowed Mr. Hodges to perform the essential functions of his job.

93.     Defendant, and/or its agents or employees acting on its behalf, failed to provide Plaintiff with Plaintiff with a reasonable accommodation, subjected him to other adverse and disparate treatment that interfered with and negatively impacted the terms and conditions of his employment, and then terminated his employment.

94.     As a direct and proximate result of Defendant's unlawful conduct, Mr. Barnes has suffered and continues to suffer considerable injury.  This harm includes, but is not limited to, loss of substantial past and future salary and income, benefits, insurance, and other entitlements to employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits.

95.     Mr. Barnes has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from DYRS's discriminatory conduct and/or its agents or employees acting on its behalf, and the stress and anxiety caused by his inability to perform his job as he desired, the stress and anxiety caused by his wrongful termination, and resulting financial hardship.

96.     As a consequence of Defendant's foregoing unlawful activities, Defendant is liable to Mr. Barnes for the resulting damages, the attorneys' fees and costs incurred in bringing this action, and all post and pre-petition interest.

### FOURTH CAUSE OF ACTION

**Violation of the District of Columbia Human Rights Act**
**Discrimination Based Upon Disability and/or Perceived Disability**

97.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-96 as if fully set forth herein.

98.     Defendant, the District of Columbia DYRS, was, at all times relevant to this matter, the employer of Mr. Barnes for all purposes under the District of Columbia Human Rights Act (the "DCHRA").

99.     Mr. Barnes is legally blind, and was legally blind, at the time that DYRS hired Mr. Barnes. His limited visibility was a physical impairment that substantially limited his ability to walk, work, and/or otherwise engage in other major life activities.

100.     Defendant and/or its agents or employees, acting on its behalf, subjected him to discrimination on the basis of his disability or perceived disability by failing to provide reasonable accommodations for his disability and by terminating his employment based on his disability or perceived disability.

101.     Defendant was at all times informed of Mr. Barnes's disability and/or perceived disability as well as his need for an accommodation due to his disability.

102.     Defendant failed to provide Mr. Barnes with a reasonable accommodation and failed to engage in a meaningful interactive process and communication with Mr. Barnes and/or his physicians to determine an appropriate and reasonable accommodation for Mr. Barnes as required by law. This and other adverse treatment constituted illegal discrimination against Mr. Barnes because of his disability and/or perceived disability.

103.     Defendant, and/or its agents or employees acting on its behalf, failed to provide Plaintiff with Plaintiff with a reasonable accommodation, subjected him to other adverse and

disparate treatment that interfered with and negatively impacted the terms and conditions of his employment, and then terminated his employment.

104.   As a direct and proximate result of Defendant's unlawful conduct, Mr. Barnes has suffered and continues to suffer considerable injury.  This harm includes, but is not limited to, loss of substantial past and future salary and income, benefits, insurance, and other entitlements to employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits.

105.   Mr. Barnes has also suffered from emotional distress arising from the loss of his job, the damage to his professional reputation and the embarrassment, humiliation, and indignity arising from DYRS's discriminatory conduct and/or its agents or employees acting on its behalf, and the stress and anxiety caused by his inability to perform his job as he desired, the stress and anxiety caused by his wrongful termination, and resulting financial hardship.

106.   As a consequence of Defendant's foregoing unlawful activities, Defendant is liable to Mr. Barnes for the resulting damages, the attorneys' fees and costs incurred in bringing this action, and all post and pre-petition interest.

### FIFTH CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e
Creation of Hostile Work Environment and/or *Quid Pro Quo* Claims**

107.   Plaintiff repeats and re-alleges the allegations of paragraphs 1-106 as if fully set forth herein.

108.   Defendant engaged in systemic disability discrimination against Mr. Barnes by subjecting him to a hostile work environment, harassment, and/or *quid pro quo* discrimination in violation of Title VII, 42 U.S.C. §§ 2000e, *et seq.*, as amended.

109.    Defendant's conduct has been intentional, deliberate, willful and conducted in callous disregard of the rights of Mr. Barnes.

110.    By reason of Defendant's discrimination, Mr. Barnes is entitled to legal and equitable remedies available under Title VII.

## SIXTH CAUSE OF ACTION

### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e
### Plaintiff's Claims for Retaliation

111.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-110 as if fully set forth herein.

112.    Defendant engaged in systemic disability discrimination against Mr. Barnes when he protested, opposed, and/or spoke out against Defendant's disability discrimination and Defendant's continuing failure to accommodate his disability.

113.    Defendant's conduct has been intentional, deliberate, willful and conducted in callous disregard of the rights of Mr. Barnes.

114.    In retaliation for engaging in a protected activity, Defendant subjected Mr. Barnes to adverse employment actions.

115.    Defendant's retaliation against Mr. Barnes for opposing disability discrimination and/or exercising his legal rights violates Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, as amended.

116.    As a result of Defendant's retaliation, Mr. Barnes suffered extreme harm.

117.    By reason of Defendant's illegal retaliation, Mr. Barnes is entitled to legal and equitable remedies available under Title VII.

## SEVENTH CAUSE OF ACTION

### Violation of the District of Columbia Whistleblower Protection Act

118.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-117 as if fully set forth herein.

119.    The District of Columbia Whistleblower Protection Act, (the "DCWPA") prohibits the District of Columbia or its agencies, including officers of the District of Columbia, from taking prohibited personnel actions or otherwise retaliating against a District of Columbia employee because of the employee's protected disclosures that the employee reasonably believes evidences gross mismanagement, gross misuse of waste of public resources or funds, abuse of authority in connection with the administration of a public program, or violation of federal, state, or local law, rule, or regulation.

120.    Mr. Barnes was an employee of the District of Columbia who holds rights guaranteed by the DCWPA to make protected disclosures as defined by the Act.

121.    Mr. Barnes made a protected disclosure to the Mayor and two deputy mayors concerning, among other things, the gross mismanagement, gross misuse of public resources and funds, and abuse of authority in connection with the administration of Defendant DYRS.

122.    As a direct and proximate cause of the Mr. Barnes's protected disclosures, Defendant has subjected Mr. Barnes to prohibited personnel actions, including the discrimination against Plaintiff, unwarranted reprimands against Plaintiff, and Plaintiff's termination.

123.    By retaliating against Mr. Barnes, Defendant has exhibited an extreme and reckless disregard of, and callous indifference to, his rights under the DCWPA.  Defendant's actions described above have been in willful and wanton disregard of Plaintiff's rights, and were taken in order to specifically harm him for his disclosures protected by the DCWPA.

124.    The repeated prohibited personnel actions and other adverse actions taken against Plaintiff by Defendant DYRS has caused Plaintiff to suffer damages and injuries, including lost wages, lost career opportunities, pain and suffering and humiliation, anxiety, and harm to Mr. Barnes's reputation.

### PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

A.    Judgment in favor of Plaintiff and against Defendant for deprivation of Plaintiff's rights under the ADA in an amount not less than $500,000;

B.    Judgment in favor of Plaintiff and against Defendant for deprivation of Plaintiff's rights under the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e in an amount not less than $500,000;

C.    Judgment in favor of Plaintiff and against Defendant for deprivation of Plaintiff's rights under the DCHRA in an amount not less than $500,000;

D.    Judgment in favor of Plaintiff and against Defendant for deprivation of Plaintiff's rights under the DCWPA in an amount not less than $500,000;

E.    treble damages in an amount to be determined at trial;

F.    reasonable attorneys' fees;

G.    an award to Plaintiff of his expenses, reasonable attorneys' fees, and costs;

H.    punitive damages in an amount to be determined at trial on the issues,

I.    pre and post-judgment interest and all costs related to the filing of this action, and;

J.    such other and further relief as the Court deems just, reasonable, and appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury of 12 persons of all issues so triable.

Dated: October 21, 2013                     Respectfully submitted,

                                            THE LAW OFFICE OF JAMES FOURNIER

                                            By:_____
                                            James L. Fournier
                                            D.C. Bar No. 462429
                                            69 Bryant Street, N.W,
                                            Washington, DC 20001

                                            *Counsel for Plaintiff Kenneth Barnes*

- 23 -